In re CHARGE TO GRAND JURY.

(District Court, N. D. New York. March 19, 1895.)

LACK OF FACILITIES FURNISHED TO THE COURT FOR THE TRANSACTION OF BUSI-
NESS—NEED OF AN OFFICIAL STENOGRAPHER—NEED OF ADDITIONAL BAIL-
IFFS — WANT OF PROVISION FOR FURNISHING MEALS TO JURORS IN CIVIL
CASES—FAILURE TO PROVIDE FUNDS FOR TERMS OF COURT.

The following is a portion of a charge delivered to a grand jury
at Utica by the district judge (ALFRED C. COXE) March 19, 1895,
together with a presentment thereon made by the grand jury, at
Utica, March 27, 1895.

COXE, District Judge (charging grand jury). There is another mat-
ter to which I desire to call your attention, with the request that,
after investigation, you make such presentment upon the subject as
you may deem proper.  I refer to the facilities, or, rather, the lack of
facilities furnished to this court.  All patriotic citizens, no matter
how they differ upon other subjects, unite in the desire that the
courts of our country shall be conducted with dignity and decorum,
so as to command the respect and confidence of all.  The people
of this state have favored every amendment to the constitution
intended to increase the efficiency of the courts.  It is unnecessary
for us to emulate the pomp and ceremony which surround the tri-
bunals of foreign countries, but it is of the utmost importance that
our courts, both state and federal, should be provided with the
necessary conveniences with which to transact the business con-
fided to their care in a decorous manner and in conformity with
modern usages.  Especially is this true of the federal courts, which
represent the judicial branch of the national government, and are
charged not only with the interpretation and construction of the
national laws, but often with the maintenance of the national honor.
They should be models in all that goes to make up a dignified, effi-
cient and orderly judicial tribunal.  Not only are the means and
appliances furnished these tribunals inferior in many respects to
those of the highest courts of our state, but, I believe, that it can
be demonstrated that the circuit and district courts of the United
States, charged with the decision of the most vital and far-reaching
questions, having to dispose of causes often involving millions
of money, have not as good facilities for the transaction of busi-
ness as some of the police courts of our larger cities.

Let me be more specific.  A stenographer is now a necessary
adjunct of every well-conducted trial.  In this age of superlative
progress we are not contented to revert to the antique methods of
a quarter of a century ago.  Time and money are saved by enlist-
ing the services of those expert writers, who are able to take the
evidence as fast as it falls from the lips of the witnesses.  A court
that adopts the method of writing down the evidence in long
hand is regarded as intolerably slow and behind the age, and yet
in the United States courts there is no official stenographer.  Other
courts have felt the impulse of modern progress, but the federal
courts in this respect are in the condition of a century ago.  When

a stenographer reports a civil cause here he is furnished and paid for by the lawyer for the plaintiff, or defendant, unless they agree to divide the expense between them. The presiding judge has no control over his action. He follows the direction not of the court, but of the parties who employ him. There is no official record. The inconvenience and impropriety, to say nothing of the graver abuses which may occur, and do occur under this system, suggest themselves at once. Not only is it unfair to litigants to compel them to bear this burden, but it is unseemly that one who bears such an important relation to the court should be the paid assistant of the attorneys. It is true that in some of the causes tried here the services of a stenographer are not needed. It may be that you will say that the appointment of an official stenographer is unnecessary, but surely the court should have the authority to employ one in every case where, in the opinion of the judge, the issues involved are of sufficient importance to justify the expense.

Again, a few years ago, in 1888, I believe, the congress of the United States paused long enough from the task of elucidating the momentous questions which confronted it, to pass a bill reducing the number of bailiffs in the federal courts from five to three. After an experience of 12 years upon the bench, I am prepared to assert that it is simply impossible to conduct the business of the United States courts in this district in an orderly and proper manner, with only three bailiffs. A moment's consideration will make this plain. One bailiff is necessary for attendance upon the grand jury, one at the door of the court room, one in the court room to preserve order, one to attend a petit jury when deliberating on their verdict, one should be assigned to the district attorney, and at least two should be detailed to conduct the prisoners to and from the jail. Here are seven whose presence is essential, and, besides this, the services of several more are often very useful. For instance, at a recent term of court four petit juries were deliberating at once. The three bailiffs and the crier were impressed into the service, and the court was for a time left without a single officer in attendance. With work for seven officers, the court is allowed but three. Compare this condition of affairs with the courts of our state. During a recent investigation in this county a sheriff was criticised because, as I remember the accusation, he employed 13 constables at ordinary terms of the circuit court. Several lawyers of prominence and experts in such matters gave testimony, and though some thought that 13 was too large a number, no one, I believe, put the number of necessary officers at less than eight; this in a local court and in a court where few criminals are tried. Here, on the contrary, the time of the district court is largely occupied in the trial of criminals. Strangers from all parts of the United States and a motley assemblage, representing all sorts and conditions of men, gather before its bar. It goes without saying that the maintenance of order in such a tribunal requires the services of a larger number of officers than in a local court, where every one is known

and where civil causes largely predominate. A misunderstanding between the judges of the court of general sessions in the city of New York caused an investigation a few weeks ago in which it appeared that 40 officers are constantly assigned to duty in the criminal courts, 10 being in attendance upon each branch of the court. The judges, though differing upon other matters, all agreed that this number was insufficient. Since the number of bailiffs in the federal courts has been reduced to three we have often been in a lamentable condition. The court has frequently been entirely without officers, all of them being detailed for necessary outside duty. Preservation of order has been at times almost impossible. In trials of public interest the presiding judge has frequently seen men standing upon the seats and window sills and conducting themselves more as if they were in a theater than in a court of justice. The judge has been powerless to prevent these unseemly exhibitions. Several prisoners have escaped for lack of sufficient officers to guard them. At a recent term of the court one of the prisoners left the prisoners' box, came up upon the platform behind the bench and commenced a conversation with the judge during the trial of a cause. There was no officer in the court room to see the impropriety, not to say indecency, of such conduct and prevent it. It seems to me intolerable that the court should be crippled thus in the discharge of its duty in order that the government may save the two dollars per day which would be paid to a few extra bailiffs. This is not economy, it is parsimony.

Again, there is no provision made for furnishing meals to jurors in civil cases. The time has gone by when jurors can be starved into a verdict. Common decency and common humanity require that while they are endeavoring to reach a conclusion they should be furnished at least with the ordinary necessities of life, and yet in civil cases in the United States circuit court their meals must either be paid for by the parties to the litigation or the jury must be discharged after a few hours deliberation. The expense, delay and trouble of a second trial is thus made necessary. The short-sighted character of this policy is made apparent when it is remembered that the cost of one second trial may exceed the cost of supplying meals to jurors for years to come.

I might go on indefinitely enumerating instances of the penurious policy pursued towards the federal courts. Often they are entirely without means. Some of you remember that only last year congress wholly failed to provide money for this term and the court was adjourned without date. From the inconveniences of that adjournment the court has hardly yet recovered. In New York City where the courts are practically in session during the entire year the pay of the court officers is several months in arrears. I am informed that some of them, being unable to pay their rent, have been turned into the streets by their landlords. In this district the marshal has several times been compelled to borrow money in order to hold a term of court, or has given the jurors and witnesses vouchers which they have negotiated at local banks at

a ruinous rate of discount. The district attorney, the marshal and the clerks will go before your body if requested to do so and doubtless will inform you upon these and other matters which may occur to them. I have been hoping for years that a congress would some day assemble which would deal with the federal courts, if not in a liberal, at least not in a niggardly and hostile spirit, but as matters in this regard have constantly been growing worse instead of better I have concluded, after consultation with the other officers of the court, to call your attention to what we all consider serious obstacles in the path of efficient work. It is possible that this treatment grows out of indifference, or lack of information on the part of those in the legislative and executive branches of, the government. Such treatment is surely unbecoming a great and powerful nation and it is possible that your presentment may call attention to the subject and result, in a more liberal policy in the future.

In accordance with the above charge, the grand jury made the following presentment to the district court at Utica, March 27, 1895:

We have examined and heard the statements of the United States attorney, his assistants having charge of the presentation of cases before us, the United States marshals and the clerks of the circuit and district courts respectively, and as the result of our inquiry make this presentment:

The investigation developed a most surprising condition of affairs. We doubt if one in a thousand of our fellow citizens has any knowledge of the fact that while terms of United States courts are required by statute to be held at stated times and places, a failure of congress to make necessary appropriations or the neglect of a department at Washington promptly to honor ' a requisition for money to defray expenses, nullifies the statute by preventing the holding of the court. It seems incredible, nevertheless it is true, that the presiding judge has no power to make any order involving the payment of money to defray any expense connected with the proper conduct of the business of the court, other than pay of jurors and fees of witnesses, without the sanction of the department of justice previously obtained, and that the marshal, the executive officer of the court, is often placed in the position of either disobeying orders requiring the payment of money for some unexpected expense, or taking the alternative of making the payment at personal risk. To-day, almost at the close of the nineteenth century the expenditures of United States courts are controlled and limited .by statutes enacted from fifty to one hundred years ago, and by restrictions inserted in appropriation acts passed by the congress of the United States which are a disgrace to our nation. As grand jurors sworn and charged well and truly to inquire of such matters and things as shall be given us in charge we deem it our duty to call attention to some of the most glaring deficiencies brought to our notice.

United States courts are the only courts of record sitting in this state not provided with stenographers. It is unnecessary to make argument concerning the necessity of an official stenographer in a court of justice in this age of progress and pressure. We find it to be a fact, notwithstanding, that in the trial of criminal cases, a stenographer, if employed, must be paid either by the defendant or the United States attorney at individual expense; in civil cases the stenographer is not under control of the court, his minutes are unofficial, and if objected to, the end of his employment is defeated. In many cases the failure to provide a stenographer works injustice to the litigants; in all cases the economy which lops off this expenditure defeats its object and becomes an extravagance by protracting trials, thereby adding largely to the expense for witnesses and jurors. Without entering into details we feel justified in finding, from the evidence before us, that the salary of a competent stenographer for an entire year would be saved by the decrease in other expenses at a single important term of court.

In 1888, by an enactment in the legislative and judicial appropriation bill, the number of attendants at all courts of the United States except those held in the Southern district of New York, was fixed at three bailiffs and one crier; should additional attendants be required they can be secured only by application made by the marshal, before the sitting of the court, to the department of justice for authority to employ a specified number of laborers. A presentment, complete in itself, could be made upon the annoyance and difficulty caused the court, and the absolute injury to and delay of justice caused by this penny wise pound foolish legislation. We find that during the term of court held at Albany in 1894, the court was left absolutely without attendants, no less than four petit juries being out of court deliberating upon causes tried and submitted; the fourth being in charge of the crier of the court; that during the session of the court a prisoner left the prisoner's box, mounted the bench and addressed the presiding judge, there being but one bailiff available for and on duty in the court room and he too far away to prevent the unseemly performance. At the present term we have observed prisoners going to and from jail to court inadequately guarded. We have seen the proceedings of the court delayed for lack of sufficient officers to bring prisoners to court. For the last five days we have seen from four to thirteen prisoners in court at the same time, the room crowded to overflowing with attorneys, litigants, witnesses and spectators and a meager force of two or three bailiffs to preserve order and guard the prisoners. Escapes of prisoners in this district have occurred more than once for want of sufficient guards, and this week we received an object lesson when called on to consider the case of a prisoner under sentence, who made a most desperate and wellnigh successful attempt to rescue himself and five other prisoners who were proceeding from court to jail under the guard of two bailiffs. That the attempt failed was due only to the opportune presence of the sheriff of this county and one of his deputies. If the people are to respect the courts, their proceedings must be conducted with such order and dignity as will cultivate and inspire that respect. During the past few years the power of the courts of the United States has been repeatedly invoked to repress riots, demonstrations and unlawful interference with property; in many instances respect for the mandate has been the only deterrent force required. If that respect is to continue, the courts must have at least the authority to enforce order within their own precincts. Their sessions are public, attended by all the people, and we submit that nothing is more calculated to destroy respect and inculcate contempt than the spectacle of a court powerless to enforce order, practically at the mercy of the spectators; and all to save the United States the salary of two dollars a day for the number of bailiffs necessary to assure order and decency in the conduct of judicial proceedings. We believe that our fellow citizens have no sympathy with or support for legislation which requires pretended economies of this character.

In criminal cases the court decides that the interests of justice will be promoted by holding the petit jury together from the time it is impaneled until a verdict is rendered, or an agreement becomes impossible. Here, again, we find the court hampered by the statute limiting the number of attendants, and by regulations requiring applications to be made in advance to the department of justice, for authority to incur the expense for board of jurors and officials in charge. Such statutes and regulations serve no good purpose; they embarrass and ofttimes defeat the proper administration of justice. In all cases where the United States is not a party, we were astounded to learn that the barbarous and inhuman custom of past centuries still prevails in United States courts, and that a jury in such cases, after retiring to deliberate upon their verdict, literally and truly can have neither meat nor drink, water excepted, at the expense of the United States. If not fed at the cost of the litigants, which can be done only by stipulation, jurors must feed themselves or starve. We find that the cost to the United States of one mistrial, which occurred in the circuit court of this district because the judge humanely declined to allow the jury to deliberate until they agreed or starved, would have more than paid for all meals likely to be furnished jurors for at least two years.

That the court cannot transact business unless provided with a reasonable amount of stationery is self-evident. We find that to procure such stationery,

the marshal must make application to the department of justice in advance for authority to make the purchase. His application for such authority for this term, made in due season, has not yet been granted, although court has been in session over a week, and had he not purchased the necessary articles without authority and at his own risk, the court would have convened without any stationery to use in the transaction of its business. Comment on regulations of this character is useless. They are unnecessary and indefensible, still they are but part and parcel of the system unsuitable to the demands of the age, and which ingrafted from time to time with the results of hasty, undigested legislation, seems to have been devised and maintained for no other purpose than to annoy and embarrass litigants and place every possible obstacle in the way of the proper, orderly and speedy administration of justice.

The evils specified could easily be remedied by the passage by congress of general laws giving the courts of the country control over expenditure necessary to provide proper facilities for the transaction of their business. To say that the courts of our country cannot be trusted with the administration of such a fund would be an insult to a judiciary that annually and finally disposes of questions involving sums in comparison with which the expenses of the maintenance of the courts are but a trifle.

Without entering into details, we recommend the passage of such laws as will provide for the courts:

First—A permanent appropriation to be drawn upon by the marshal of each district, upon the approval of the circuit or district judge, his expenditures to be audited and allowed by the court, such audit and allowance to be final.

Second—The repeal of the law fixing the number of bailiffs and providing that the number be fixed from time to time by the court upon application of the marshal.

Third—The issue under the authority and at the expense of the United States to each marshal of a sufficient number of badges, or other designation of office, to be worn by the bailiffs while on duty. At present it is impossible to distinguish a bailiff from a spectator or witness.

Fourth—The employment of an official stenographer for each court. Such stenographer to be appointed by the presiding judge.

Fifth—The enactment of such other laws as may be necessary to place the courts of the United States upon an equal footing with the supreme court of this state regarding the facilities for the transaction of business by the court and the judges thereof sitting, either in chambers or at places other than their residence.

After the presentation had been made, Judge COXE, addressing the jury, said:

"I wish to thank you, gentlemen, for the thorough investigation you have made of the matters to which your attention was called by me at the opening of the court. The full, clear and convincing presentment which you have made on this subject will, I am sure, excite wide interest not only in this district but throughout the United States. I feel confident that it will do much to bring about reforms so much needed.

"You are discharged with the thanks of the court for the able and efficient manner in which you have discharged your duty."